**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DAVID ULLOA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 08 C 4918** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **COMMISSIONER OF SOCIAL** | ) | **Magistrate Judge Morton Denlow** |
| **SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Claimant David Ulloa ("Claimant") seeks reversal or remand of the decision by

Defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner" or

"Defendant"), denying Claimant's application for Disability Insurance Benefits ("DIB").

This case presents the following issues: (1) whether substantial evidence supports the

Administrative Law Judge's ("ALJ") decision; (2) whether the ALJ adequately articulated

the grounds for his decision in light of the district court's remand order; (3) whether the ALJ

erred by finding Claimant generally credible, but failing to apply Claimant's testimony or

explain his reason for accepting portions of the testimony but not others; and (4) whether the

ALJ erred in considering testimony from the Vocational Expert ("VE") by posing a

potentially improper hypothetical and by disregarding the testimony of the VE at the first

hearing. For the following reasons, the Court denies Claimant's motion to reverse or remand

the final decision of the Commissioner and grants the Commissioner's motion to affirm the

Commissioner's decision that Claimant was not disabled.

# I. BACKGROUND FACTS

## A. Procedural History

Claimant initially applied for DIB on October 2, 2000, alleging a disability onset date of February 17, 2000. R. 53-55. The Social Security Administration ("SSA") denied his application on January 22, 2001. R. 33-36. Claimant then filed a request for reconsideration, which was also denied. R. 40, 42-44. Subsequently, Claimant requested a hearing before an ALJ. R. 47. On September 10, 2002, ALJ John L. Mondi ("ALJ Mondi") presided over this hearing at which Claimant appeared with his attorney and an interpreter. R. 329, 331. A vocational expert, Gleeann Kehr, also testified at the hearing. R. 331, 350-56. In a decision dated January 31, 2003, ALJ Mondi denied Claimant's claim. R. 20-25.

Claimant ultimately sought judicial review and the district court remanded the case for further hearing. *Ulloa v. Barnhart*, 419 F. Supp. 2d 1027, 1035-38 (N.D. Ill. 2006); R. 441-59. In remanding, the district court found that ALJ Mondi's "RFC determination [wa]s not supported by substantial evidence because he failed to sufficiently articulate his assessment of the evidence to enable [the court] to trace the path of [the ALJ's] reasoning." *Ulloa*, 419 F. Supp. 2d at 1036; R. 456. The district court stated that "[o]n remand, the ALJ must reevaluate whether Dr. Shah's, Dr. DePhillips' and Dr. Segura's opinions [Claimant's treating physicians] are entitled to controlling weight. If the ALJ finds that any of these opinions is not entitled to controlling weight, the ALJ needs to explain the basis for that finding." *Ulloa*, 419 F. Supp. 2d at 1037; R. 457; s*ee also* R. 405 (Appeals Council's

effectuation of the district court's remand order).

In the interim, Claimant reapplied for DIB, and was ultimately found to be disabled as of February 1, 2003 by ALJ Daniel Dadabo ("ALJ Dadabo"). R. 483-87. Due to the then-pending district court appeal, ALJ Dadabo did not address the period prior to February 1, 2003 as he found it was not within the ALJ's jurisdiction. R. 475. The Appeals Council affirmed ALJ Dadabo's finding that Claimant was disabled as of February 1, 2003, but ordered a remand to determine whether Claimant was disabled from his alleged onset date of February 17, 2000 through January 31, 2003. R. 402-05.

On January 11, 2007, ALJ Paul Armstrong (the "ALJ" or "ALJ Armstrong") presided over a hearing at which Claimant appeared with his attorney and an interpreter. R. 406-40. A medical expert, Walter Miller, M.D., ("ME") and a vocational expert, Julie Bose, also testified at the hearing. R. 408. On January 31, 2007, the ALJ issued a decision finding Claimant was not disabled from his alleged onset date of February 17, 2000 through January 31, 2003 because he was able to perform a significant number of jobs existing in the national economy. R. 367-75. Claimant then filed for a review of the ALJ's decision, and the Appeals Council denied the request by letter on July 1, 2008. R. 358-60. Therefore, the ALJ's decision became the final decision of the Commissioner. Claimant subsequently filed this action for review pursuant to 42 U.S.C. § 405(g).

**B.** **Hearing Testimony - September 10, 2002 ("First Hearing")**

**1.** **David Ulloa - Claimant**

As of this hearing, Claimant was thirty-four years old, but was thirty-two years old

on the alleged onset date. R. 53, 334, 335. Claimant was married, and living with his wife, son, his sister-in-law, and his sister-in-law's baby. R. 341. Claimant was educated through the sixth grade in Mexico. R. 334. Claimant was unable to communicate in English and cannot read or write in English. R. 334-35. Claimant testified he could read and write in Spanish, but not very well. R. 334. All of Claimant's past relevant work experience was as a machine operator, cutting steel. R. 336-37, 348. His job responsibilities required him to lift steel weighing more than twenty pounds. R. 337.

On February 17, 2000, Claimant injured his back while working. R. 333, 335; *see also* R. 126). Claimant was off work until May 10, 2000. R. 335. From May 10, 2000 through August 2000, Claimant returned, unsuccessfully, to work with his former employer. R. 335. His employer assigned him to a different job where he was not required to do any lifting. R. 336. His new responsibilities included completing inventory work, operating a forklift, and instructing other employees on how to operate machinery. R. 335, 349. In describing his attendance after returning to work, Claimant testified that he would often miss between four to seven days a month and that he would sometimes have to leave work early or only work half a day. R. 336, 345-46. As described below, this was because Claimant experienced pain in his lower back and legs and dizziness while standing. R. 338. Ultimately, Claimant stopped working because his employer wanted him to perform heavier tasks than he could perform. R. 336. The SSA considered this attempt to be an unsuccessful work attempt. R. 78.

During this hearing, Claimant testified he was unable to work due to pain in his lower

back and legs and bouts with dizzy spells. R. 338. His pain in his back and legs prevented him from standing or sitting for prolonged periods of time. R. 336, 338. He experienced dizziness after about ten minutes of standing. R. 338. He could walk about ten minutes without stopping to rest. *Id.* Furthermore, Claimant testified he could only sit for about twenty to thirty minutes. *Id.* Claimant used a cane when out of his home, but did not generally use the cane while at home. R. 338-39. He was able to climb stairs with the assistance of a railing, and while painful, was able to bend and stoop. R. 338.

On a typical day, Claimant does some exercises prescribed by his doctor, bathes, eats, and reads the Bible. R. 341-43. He is able to take care of himself, but does not do much housework. R. 342. He sometimes walks around outside, including walking to the store, which is five minutes away. R. 342-43. He cooks or cleans "every once in awhile." R. 342. He also goes to church. R. 343. After his injury, Claimant went to physical therapy for about six months. *Id.*

Claimant testified that his condition was getting worse. R. 343. He did not know whether he needed more therapy to address the pain or whether the worsening of his condition was because he was sitting around a lot. *Id.* Between his first and second hearing, Claimant developed additional medical problems, namely neck problems that caused numbness in his hands. R. 415-16. Claimant refused to undergo surgery proposed by Dr. George DePhillips, M.D., ("Dr. DePhillips") because (1) Dr. DePhillips told him there was a fifty percent chance of improvement and (2) he had talked with other patients whose similar surgeries rendered them worse off after surgery. R. 345.

## 2.    Gleeann Kehr - Vocational Expert

The Vocational Expert, Gleeann Kehr, reviewed Claimant's file and was present throughout the hearing.  R. 331, 350.  First, the VE discussed Claimant's work history.  She testified Claimant's past relevant work is consistent with that of a machine operator.  R. 350.  The VE considered such work to be heavy and unskilled.  *Id.*

Next, the VE answered several hypothetical questions posed by ALJ Mondi.  The VE first opined an individual with Claimant's work experience, age, education, with the RFC of light work and subject to postural limitations, would not be able to return to any past work.  R. 351.  The VE was then asked to determine whether there was any other work in the regional or national economy available for such a person.  *Id.*  Ultimately, the VE concluded that such work was available.  *Id.*  The VE concluded approximately 4000 machine operator, 3000 assembly, and 3000 packing positions were available within the Chicago metropolitan area.  R. 351-52.

The VE then opined a lifting restriction of ten pounds would reduce, but not eliminate the availability of jobs.  R. 352.  The VE was then asked to assume a sit/stand option, to which the VE concluded all manufacturing jobs would be precluded.  *Id.*  Finally, the VE testified that an individual who "would need to miss four to seven days per month" would be precluded from performing substantial gainful activity.  R. 353.

## C.    Hearing Testimony - January 11, 2007 ("Second Hearing")

### 1.    David Ulloa - Claimant

As of the second hearing, Claimant moved to a new house, where he lives on the first

floor.  R. 421.  Claimant testified he was still married and now has two children.  *Id.*

Claimant's testimony during this second hearing was very much like the first. Claimant testified he must alternate between sitting and standing every fifteen to twenty minutes.  R. 412.  Claimant testified he still used his cane, with which he can walk for about twenty minutes.  R. 415.  Claimant added he sometimes has to lie down for two to three hours.  R. 412.  Additionally, Claimant described other problems that had developed since the first hearing, including a problem with his neck, which caused numbness in his hands. R. 415-17.

In reviewing his attendance after returning to work in 2000 following his injury, Claimant testified he had to stay away from work about seven to eight times a month.  R. 417.  Furthermore, he sometimes had to leave work early or just work a half day.  R. 417, 418.  Claimant repeated that his employer tried to accommodate him, but that he ultimately could no longer work because they could not give him work he was capable of doing.  R. 418.  Claimant also repeated his reason for not electing to have the surgery suggested by Dr. DePhillips.  R. 419-20.  Claimant also restated that his condition was getting worse.  R. 424.

### 2.    Walter Miller, M.D. - Medical Expert ("ME")

The medical expert, Dr. Walter Miller, M.D., a surgeon, examined Claimant's file and was present through the hearing.  R. 408, 421-31.  The ME noted there did not appear to be any significant nerve root compression, nor did straight leg raising cause significant radicular

pain. R. 427. To this end, the ME concluded Claimant did not have radiculopathy.[1] *Id.* The ME further concluded there was no evidence Claimant met a listing, or even came close to one. R. 428. While noting Claimant had an injury that caused pain, the ME testified that the pain would be relatively light. *Id.* Thus, during the time frame at issue, the ME concluded Claimant was capable of light work. *Id.*

### 3. Julie Bose - Vocational Expert

The Vocational Expert, Julie Bose, reviewed Claimant's file and was present throughout the hearing. R. 408, 431-39. First, the VE discussed Claimant's work history. She testified Claimant's past relevant work is consistent with that of a welding machine operator. R. 431. As performed by Claimant, such a position is heavy in physical demand and is considered medium in physical demand and unskilled by the Dictionary of Occupational Titles ("DOT"). *Id.*

Next, the VE opined an individual limited to light exertional duties, with no work at unprotected heights or around dangerous moving machinery, open flames or bodies of water would not be able to perform any of Claimant's past relevant work. *Id.* The VE was then asked to determine whether there was any other work in the regional or national economy available for such a person. R. 431-32. The VE concluded that such work was available. R. 432-33. Due to Claimant's communication restriction and the unskilled nature of his prior work experience, the VE reasoned only manufacturing positions would be available to such

---

[1] Radiculopathy is defined as a "[d]isorder of the spinal nerve roots." Stedman's Medical Dictionary (27th ed. 2000).

a person, and such positions were available within the Chicago metropolitan area. *Id.*

The VE also assumed a limitation of sedentary exertional duties (sit down job, lifting restriction of ten pounds, and a sit/stand option).[2] *Id.* The VE opined that given these restrictions, job availability would be reduced, but jobs were still available. *Id.* Specifically, the VE opined that between 3200 and 4000 positions[3] in the Chicago metropolitan area as a sorter, hand packer, and bench assembler would be available with these hypothetical restrictions. *Id.* Next, the VE was asked to assume the individual could only work a total of four to six hours a day. *Id.* The VE testified such an individual could not work on a full-time basis. R. 432-33. Finally, the VE was asked to assume the individual would have to lie down during the work day from one to three hours per day. R. 433. The VE concluded that such a restriction would eliminate all jobs. *Id.* A restriction of missing more than two days a month would also eliminate all jobs. *Id.*

D.    **Medical Evidence**

Claimant sustained a back injury while at work on February 17, 2000. R. 126. Claimant reported immediate pain to his lower back, and subsequently to his left leg. R. 126, 135, 153.

---

[2] The VE also testified that the inability to bend forward without any range of motion would prevent an individual from all jobs in the national economy, including all sedentary or light jobs. R. 435-36. However, a limitation to just no forward bending would only eliminate light jobs, and would allow for an individual to work in sedentary jobs. R. 436.

[3] The VE targeted 800 to 1200 sorter, 1200 to 1400 hand packer, and 1200 to 1400 bench assembler positions. R. 432.

### 1.  Dr. Joe Santiago, D.C. - Chiropractor

Following his injury, Claimant visited Dr. Joe Santiago, D.C. ("Dr. Santiago"), a chiropractor, from February 21, 2000 to April 7, 2000.  R. 123, 134-76, 180-87.  Treatment notes continued to reflect Claimant's reports of pain in his lower back and leg.  *Id.*  Claimant began a physical therapy regime.  *See* R. 138, 154.  On February 25, 2000, a radiology report showed symptoms of degenerative disc disease in Claimant's lumbar and thoracic spine.  R. 132.  On March 7, 2000, Dr. Santiago diagnosed Claimant with lumbar disc syndrome,[4] thoracic nerve root disorder, and vertebrogenic[5] pain syndrome.  R. 305.  In this diagnosis, Dr. Santiago found while Claimant had full range of motion of the cervical and thoracolumbar spine, he had pain upon flexion and extension.  *Id.*  Dr. Santiago continued Claimant's therapy regime and opined that Claimant's prognosis was favorable, but noted his outlook was guarded given the chronic resistive nature of Claimant's condition.  *Id.*; *see also* R. 180.

Dr. Santiago then referred Claimant to Dr. Robert Segura, M.D. ("Dr. Segura"), for a neurological consultation.  R. 126, 305.  Claimant was ultimately discharged from Dr.

---

[4] Disc syndrome is "a constellation of symptoms and signs, including pain, paresthesias, sensory loss, weakness, and impaired reflexes, due to a compressive radiculopathy caused by intervertebral disk pressure."  Stedman's Medical Dictionary (27th ed. 2000).

[5] Vertebrogenic means "arising in a vertebra or in the spinal column."  Dorland's Medical Dictionary (2007), *available at* http://www.mercksource.com/pp/us/cns/cns_hl_dorlands_split.jsp?pg=/ppdocs/us/comm on/dorlands/dorland/eight/000115859.htm.

Santiago's care on April 7, 2000 as Claimant stated he did not have a car to come to the clinic. R. 181. The discharge order notes Claimant continued to have pain in his back and legs, which caused him to become dizzy. *Id.*

## 2. Dr. Robert Segura, M.D. - Neurologist

On March 10, 2000, Dr. Robert Segura, M.D., a neurologist, noted Claimant had normal stance and gait, but he suffered from reduced lumbosacral range of motion and experienced lower back and thigh pain when doing straight leg raise maneuvers. R. 126. Dr. Segura noted Claimant's symptoms had improved, but Claimant still was in pain, which became intensified by sitting. *Id.* Dr. Segura diagnosed Claimant with post-traumatic lumbar syndrome and noted Claimant was taking Salsalate and Soma. *Id.*

During a March 31, 2000 follow-up appointment, Dr. Segura noted neurodiagnositic studies were essentially unremarkable, but an MRI obtained on March 27, 2000 revealed a centrally herniated disk at L5-S1.[6] R. 127. Claimant continued to complain of low back pain and bilateral leg pain. *Id.* These conditions were triggered or aggravated when he bent forward. *Id.* Dr. Segura recommended that Claimant continue conservative management. *Id.* Dr. Segura also released Claimant back to work, with restrictions, as of April 6, 2000. *Id.* Such restrictions were mainly in terms of his posture; the restrictions provided Claimant was to keep his trunk straight, to neither bend forward nor twist, and to refrain from lifting

---

[6] L5 refers to the specific vertebrae "located in the lumbar region of the back" and S1 refers to the specific "segment[] of the vertebral column . . . that fuse[s] to form the sacrum." Stedman's Medical Dictionary (27th ed. 2000).

more than twenty pounds. *Id.* While the doctor noted these restrictions were temporary, he indicated "the permanency of [these] restriction[s were] undetermined" at that time. *Id.*

### 3. Dr. Yatin M. Shah, M.D. - Internist

After being discharged from Dr. Santiago's and Dr. Segura's care in April 2000, Dr. Yatin M. Shah, M.D., ("Dr. Shah") a doctor of internal medicine, began to treat Claimant. *See, e.g.,* R. 191, 204-24. Dr. Shah noted that Claimant described his pain in his low and middle back as a "dull, nagging pain," which worsened with prolonged standing and ambulation. R. 306. Dr. Shah diagnosed Claimant with a lumbosacral[7] strain, a herniated disc, and radiculopathy in the lower extremities. R. 307. Dr. Shah advised Claimant against heavy lifting and bending and to stay off work. R. 308. Dr. Shah prescribed Naprosyn and Robaxin and also prescribed physical therapy three times a week for four weeks. *Id.*; R. 224. Claimant had physical therapy several times a week in April and May 2000. *See* R. 225-26, 228-57, 260-70. Claimant reported some improvement with these sessions. *See, e.g.,* R. 250. However, Claimant also reported he was unable to maintain any position for more than thirty minutes. R. 263. Claimant was ultimately discharged from physical therapy on May 26, 2000 per doctor's orders. R. 268-69. Claimant reported therapy helped, but it did not get rid of his lower back pain. R. 269.

Dr. Shah continued to treat Claimant for back pain through August 2002. R. 310-23. Dr. Shah's notes from April 26, 2002 indicate Claimant was afraid of surgery and thus

---

[7] Lumbosacral is defined as "[r]elating to the lumbar vertebrae and the sacrum." Stedman's Medical Dictionary (27th ed. 2000).

refused it at that time.  R. 322.  Dr. Shah's notes also indicate Claimant continued to do physical therapy at home and that he "[w]ants to apply for disability."  *Id.*  Finally, Claimant began using a cane in November 2000, and continued thereafter.  R. 284, 313, 322.

On August 30, 2002, Dr. Shah completed an assessment of Claimant's residual functional capacity ("RFC").  R. 296-97.  Dr. Shah found Claimant could lift less than ten pounds on an occasional and a frequent basis.  R. 296.  With regards to Claimant's ability to sit, stand and/or walk during a normal eight-hour work day, Dr. Shah found Claimant could not sit or stand for more than two hours during an eight-hour day.  *Id.*  Dr. Shah also noted Claimant could not engage in excessive standing, walking, or bending.  *Id.*  Dr. Shah further found Claimant could sit thirty minutes or stand ten minutes without changing position, and that he needed to walk around for ten minutes every thirty minutes.  *Id.*  Dr. Shah opined Claimant needed the opportunity to shift at will from sitting or standing/walking and also needed to be able to lie down at least twice in an eight-hour shift.  *Id.*  Dr. Shah concluded Claimant would occasionally be able to twist, stoop/bend, crouch, and climb stairs and would never be able to climb ladders.  R. 297.  Finally, Dr. Shah opined he expected Claimant to miss at least four days of work per month.  *Id.*  In support of these conclusions, Dr. Shah referenced Claimant's MRI (from March 27, 2000), which notes Claimant's dehydrated centrally herniated disk at L5-S1 and Claimant's chronic pain.  R. 296-97.

### 4.    Dr. George DePhillips, M.D. - Neurosurgeon

On April 10, 2000, Dr. George DePhillips, M.D., a neurosurgeon, examined Claimant

13

after Dr. Shah referred Claimant to him.  R. 102.  Dr. DePhillips' neurologic examination "did not reveal any motor weakness or atrophy."  *Id.*  The doctor noted straight leg raising increased pain in Claimant's lower back, but this did not cause significant radicular pain.  *Id.* Dr. DePhillips' review of Claimant's MRI determined that it showed signs of internal disk disruption and disk protrusion, but there did not appear to be significant root compression. *Id.*  Dr. DePhillips noted Claimant might be a candidate for a discectomy[8] and fusion.[9]  *Id.* Dr. DePhillips discussed epidural steroid injections with Claimant, but noted Claimant was reluctant to pursue that course of treatment.  *Id.*  Dr. DePhillips also suggested physical therapy.  *Id.*

On May 8, 2000, Dr. DePhillips conducted a follow-up examination on Claimant.  R. 105.  Dr. DePhillips noted Claimant had completed three weeks of physical therapy and he continued to complain of lower back pain with bilateral nonradicular radiation.  *Id.*  Dr. DePhillips recommended Claimant continue with another three weeks of physical therapy, as well as a lumbar epidural steroid injection.[10]  *Id.*  At the conclusion of this follow-up examination, Dr. DePhillips released Claimant to work, with restrictions, on a "light duty basis."  *Id.*  These restrictions included a ten-pound weight restriction; no excessive bending,

---

[8] Discectomy in defined as an "[e]xcision, in part or whole, of an intervertebral disk."  Stedman's Medical Dictionary (27th ed. 2007).

[9] A spinal fusion is an "operative procedure to accomplish bony ankylosis between two or more vertebrae."  Stedman's Medical Dictionary (27th ed. 2007).

[10] As noted in first district court case, Dr. DePhillips stated he was recommending a second lumbar epidural steroid injection, but there was nothing in the record indicating a first injection was ever administered.  *Ulloa*, 419 F. Supp. 2d at 1032 n.2; R. 447 n.2.

twisting, or stooping; no climbing; and no prolonged sitting or standing. *Id.* Dr. DePhillips opined that Claimant would "either have to live with his pain and continue with restrictions," or consider having surgery. *Id.*

On May 30, 2000, Dr. DePhillips conducted a follow-up examination of Claimant. R. 107. Claimant continued to complain of lower back pain and that the three weeks of physical therapy did not provide relief. *Id.* Dr. DePhillips explained to Claimant there was no evidence of nerve root compression and discussed surgical options. *Id.* Dr. DePhillips recommended restricted work for four more weeks. *Id.*

On June 27, 2000, Dr. DePhillips conducted his final examination of Claimant. R. 106. Dr. DePhillips concluded that Claimant had reached maximum medical improvement and noted Claimant did not want to consider surgical intervention. *Id.* Therefore, Dr. DePhillips recommended Claimant continue with permanent restrictions at work. *Id.*

### 5. Dr. Robert England, M.D. and Dr. Francis Vincent, M.D. - State Agency Physicians

On December 1, 2000, Dr. Robert England, M.D., ("Dr. England"), a state agency reviewing physician, reviewed Claimant's medical evidence and completed an RFC assessment. R. 285-92. Dr. England concluded Claimant could occasionally lift up to twenty pounds and could frequently lift up to ten pounds. R. 286. Dr. England also concluded Claimant could stand, walk or sit for up to six hours out of an eight-hour work day, and push and/or pull without restrictions. *Id.* Furthermore, Dr. England concluded Claimant could balance and kneel frequently, and could stoop, crouch or crawl occasionally, but could never climb ladders, ropes or scaffolds. R. 287. On May 16, 2001, Dr. Francis Vincent, M.D.,

("Dr. Vincent") affirmed Dr. England's conclusions. R. 292. However, neither Dr. England nor Dr. Vincent reviewed treating or examining source statements from Claimant's physician regarding Claimant's physical capacities. R. 291. As referenced above, Dr. Shah completed an RFC assessment of Claimant's ability to perform work-related activities on August 30, 2002. R. 296-97.

**D.     The ALJ's Decision - January 31, 2007**

Following a hearing and review of the evidence on file, the ALJ rendered a decision denying Claimant's application for DIB for the period from February 17, 2000 through January 31, 2003. R. 367-75. The ALJ reviewed Claimant's application under the familiar five-step sequential analysis. *Id.*; *see infra*, Part II.B (Disability Standard). At step one, the ALJ found Claimant had not engaged in substantial gainful activity since February 17, 2000, Claimant's alleged disability onset date. R. 370. At step two, the ALJ found Claimant had the severe impairment of degenerative disc disease of the lumbar spine. R. 370. At step three, the ALJ found Claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App 1. R. 371. The ALJ then assessed Claimant's RFC, ultimately finding that Claimant has the RFC "for sedentary work with [a] sit/stand option and no work at unprotected heights[,] or around dangerous moving machinery, open flames, or bodies of water." R. 372-73. In assessing Claimant's RFC, the ALJ found Claimant's medically determinable impairments could not reasonably be expected to produce the degree of limitations alleged by Claimant. *Id.* At step four, the ALJ found Claimant unable to perform any past relevant

work.  R. 373.  At step five, the ALJ found that jobs exist in significant numbers in the national economy that Claimant can perform.  R. 373-74.  Finally, the ALJ concluded Claimant was not under a disability from February 17, 2000 through January 31, 2003, the period in question upon remand.  R. 374.

## II. LEGAL STANDARDS

### A.    Standard of Review

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review.  *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000).  Under such circumstances, the district court reviews the decision of the ALJ.  *Id.*  Judicial review is limited to determining whether the ALJ applied the correct legal standards in reaching his decision and whether there is substantial evidence in the record to support the findings.  *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  A "mere scintilla" of evidence is not enough.  *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (quoting *Perales*, 402 U.S. at 401).  Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge between the evidence and the result."  *Ribaudo v. Barnhart*, 458 F.3d 580, 584

(7th Cir. 2006) (quoting *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000)). If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

A reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) (quoting *Lopez*, 336 F.3d at 539). It may not, however, re-evaluate the facts, "re-weigh [the] evidence . . . or substitute [its] own judgment for that of the Commissioner." *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards in reaching a decision and whether there is substantial evidence to support the findings. *Id.* at 368-69. The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

### B.    Disability Standard

Disability insurance benefits ("DIB") are available to a claimant who can establish "disability" under the terms of Title II of the Social Security Act. *Rice*, 384 F.3d at 365. An individual is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A disabled individual is eligible for DIB, however, only if she is under a disability. 42 U.S.C. § 423(a)(1)(E). An individual is under a disability if she is unable to do her previous work and cannot, considering her age, education, and work experience, partake in any gainful

18

employment that exists in the national economy. 42 U.S.C. § 423(d)(2)(A). Gainful employment is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

To make this determination, one must employ a five step sequential analysis. 20 C.F.R. §§ 404.1520(a)-(f). Under this process, the ALJ must inquire, in the following order: (1) whether the claimant is engaged in substantial gainful employment; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work in the national economy. *White v. Barnhart*, 415 F.3d 654, 657 (7th Cir. 2005). Once the claimant has proven he cannot continue his past relevant work because of physical limitations, the ALJ carries the burden to show that other jobs which the claimant can perform exist in the economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

### III. DISCUSSION

This case presents the following issues: (1) whether substantial evidence supports the ALJ's decision; (2) whether the ALJ adequately articulated the grounds for his decision in light of the district court's remand order; (3) whether the ALJ erred by finding Claimant generally credible, but failing to apply Claimant's testimony or explain his reason for accepting portions of the testimony but not others; and (4) whether the ALJ erred in considering testimony from the VE by posing a potentially improper hypothetical and by disregarding the testimony of the VE at the first hearing.

### A. Substantial Evidence Supports the ALJ's Determination That Claimant was Not Disabled.

In the instant case, substantial evidence supports the ALJ's decision that Claimant was not disabled and had the RFC for sedentary work.[11]  The ALJ based his decision on Claimant's testimony as well as objective medical evidence and other evidence, and his RFC determination was consistent with the medical evidence of record.

The medical evidence provides ample support for the ALJ's determination.  All but one of Claimant's treating doctors and all of the Agency's doctors and the ME found Claimant was at least able to perform sedentary work.  For example, both of Claimant's treating neurological specialists, Drs. Segura and DePhillips, released Claimant back to work with restrictions.  Dr. Segura made such a release less than two months after Claimant injured his back.  One month later, in May 2000, Dr. DePhillips made a similar release.  In making these determinations, Claimant's neurologists relied both on Claimant's subjective complaints and on a March 27, 2000 MRI, which revealed a herniated disk.

The state agency doctors and the ME also had access to this MRI during their respective reviews.  None of these doctors found Claimant was unable to perform at least sedentary work.  Additionally, Claimant reported relief using medication and physical

---

[11] Sedentary work is work that "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567(a).

therapy and declined to pursue surgical intervention. Finally, Claimant specifically signed a release in July 2002, as part of the terms of settlement in his worker's compensation case, indicating that he had completed medical care in connection with his work injury in November 2000.

Only one of Claimant's treating doctors found Claimant to be completely restricted from even doing sedentary work. Claimant's primary care doctor, Dr. Shah, found such a restriction in his August 30, 2002 RFC, which was prepared as part of this case. The extreme restrictions found in Dr. Shah's RFC are contradicted not only by the opinions of other doctors, but also by Dr. Shah's own treatment notes. First, Dr. Shah indicated he based his restriction upon Claimant's MRI and Claimant's subjective reports of pain. However, as noted above, Claimant's other physicians had access to this MRI and did not find such limiting restrictions. Second, Dr. Shah's own treatment notes do not substantiate the limitations he found in his RFC. For example, Dr. Shah's initial treatment notes in April 2000 restricted Claimant's lifting and bending as well as advised Claimant to not work, but these restrictions are not continued throughout his notes. Furthermore, his notes do not indicate restrictions on sitting, needing to lie down, or requiring the use of a cane. Finally, Dr. Shah's treatment notes nowhere mention any of the environmental factors from which he found Claimant to be restricted. Thus, Dr. Shah's RFC was not supported by objective medical evidence and therefore is not subject to controlling weight.

The medical evidence, examined in its entirety, reveals a common finding among the doctors that Claimant could perform sedentary work. Claimant's treating specialists, two

agency doctors, and the ME concluded Claimant was able to perform at least sedentary work, in contrast to Dr. Shah's lone opinion that was not supported by objective medical evidence and thus should be properly discounted. Therefore, the Court finds substantial evidence supports the ALJ's finding that Claimant was not disabled and could perform sedentary work.

**B.**     **The ALJ Adequately Articulated the Grounds for his Conclusion that Claimant was Not Disabled in Light of the District Court's Remand Order.**

To allow for meaningful review, the ALJ must provide an adequate articulation of his reasoning. *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007). "An ALJ must articulate, at least minimally, his analysis of the evidence so that [a] court can follow his reasoning." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). Thus, an ALJ's reasoning "must build an accurate and logical bridge between the evidence and the result." *Ribaudo*, 458 F.3d at 584. In other words, "so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, [a reviewing court] must affirm the ALJ's decision denying benefits." *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) (quoting *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996)).

The ALJ in the present case adequately articulated "his analysis of the evidence," allowing this Court to "follow his reasoning." *Skarbek*, 390 F.3d at 504. In his opinion, the ALJ found the objective medical evidence did not preclude Claimant from employment in the regional and national economy. R 372-74. In reaching this finding, the ALJ relied upon objective medical evidence, as well as testimony by Claimant, the ME, and the VE. The ALJ properly satisfied the remand order as he evaluated the opinions of Claimant's treating physicians, and where he did not give controlling weight to these opinions, he provided his reason for doing so. He specially credited these opinions to the extent they did not preclude Claimant from all work and adequately explained why he did not grant controlling weight to the extreme limitations contained within Dr. Shah's RFC. By doing so, the ALJ

adequately articulated the grounds for his conclusion that Claimant was not disabled and therefore, the ALJ "buil[t] an accurate and logical bridge between the evidence and the result." *Ribaudo*, 458 F.3d at 584.

In the first district court case, Judge Michael T. Mason found that ALJ Mondi's opinion did not adequately explain the weight given to Claimant's treating physicians. *See Ulloa*, 419 F. Supp. 2d at 1035-37; R. 454-57. Thus, upon remand, ALJ Armstrong was required to "[r]eevaluate whether Dr. Shah's, Dr. DePhillips' and Dr. Segura's opinions are entitled to controlling weight." R. 405 (Order of Appeals Council). Claimant argues ALJ Armstrong's opinion suffers the same flaw as ALJ Mondi's opinion: "[T]he ALJ failed to either credit the opinions of [Claimant's] treating doctors or logically explain, based on the record, his reasons for not doing so." Dkt. 18, at 11. This Court is not persuaded by this contention.

To the contrary, the ALJ did adequately articulate his grounds for his conclusion that Claimant was not disabled. The heart of Claimant's contention goes to the weight the ALJ gave to Dr. Shah, Claimant's treating physician. *See* Dkt. 18, at 13; Dkt. 25, at 3-5, 6-7. Claimant thus argues "[t]he ALJ should have accepted Dr. Shah's opinion and given it controlling weight." Dkt. 18, at 13. In so arguing, Claimant stresses Dr. Shah's length of treatment (over two years) and asserts Dr. Shah's opinion "was not inconsistent with the other substantial evidence." *Id.*; Dkt. 25, at 4.

In addressing Dr. Shah's opinion, the ALJ did not reject it outright. Instead, the ALJ accepted certain portions of Dr. Shah's opinion and rejected some of Dr. Shah's extreme

limitations.  *See* R. 372.  The most striking example of this balancing occurs when the ALJ discussed Dr. Shah's RFC.  The ALJ first noted Dr. Shah found Claimant to be able to only lift and carry less than ten pounds and to be able to stand and walk less than two hours.  *Id.*  As the ALJ explained, these restrictions by Dr. Shah "are consistent with the [ALJ's] sedentary RFC."  *Id.*

However, the ALJ properly rejected other portions of Dr. Shah's RFC.  These restrictions include Dr. Shah's conclusion that Claimant was unable to sit for two hours; was restricted "from *all* environmental factors;" required a cane; would miss work more than four days a month; needed to be able to lie down twice daily; and was limited to "*only* occasional postural activities and limitations on gross manipulative activity."  R. 372-73. (emphasis in original).  In rejecting these portions of Dr. Shah's RFC, the ALJ adequately explained that these restrictions were "not supported by the record."  R. 372.  Claimant put forth no argument to challenge the ALJ's conclusion that these restrictions were "not supported by the record."  In fact, this Court was unable to find treatment notes of Dr. Shah indicating such extreme restrictions throughout his two years of care.  For example, Dr. Shah's treatment notes neither reflect sitting limitations and lying down requirements, nor do they ever mention environmental restrictions.  *See* R. 306-23.  Such inconsistencies were noted by the ALJ, and disregarded with emphasis.  *See* R. 372.  Furthermore, Dr. Shah's notes initially reflected a restriction against "heavy lifting and bending" on April 7, 2000, but this restriction was not continually noted after that.  *Compare* R. 308 *with* R. 309-23.  Dr. Shah's notes also indicate Claimant was "[u]sing a cane to ambulate," but it does not appear that Dr.

Shah prescribed its use. *See* R. 313; *see also* R. 314, 316. Finally, it is notable that, as discussed below, Claimant's other treating physicians proscribed similar postural, sitting, and bending limitations, but yet still released Claimant to work.

In the alternative, Claimant points to the holding of the prior district court decision that required the ALJ to "reevaluate whether Dr. Shah's . . . opinion[ is] entitled to controlling weight." *Ulloa*, 419 F. Supp. 2d at 1037; R. 457; *see* Dkt. 18, at 12-13; Dkt. 25, at 4. This Court finds the ALJ adequately reevaluated Dr. Shah's opinion, in light of the district court's remand order. First, it is important to note Dr. Shah's opinion stands in contrast to the opinions of Claimant's two neurologists, Drs. DePhillips and Dr. Segura, the agency's two reviewing physicians, and the ME. While the opinions of these other doctors do not completely conform to the RFC assigned by the ALJ, none of these five doctors ever found Claimant to not be able to work. These five doctors also were aware of the March 27, 2000 MRI, the only objective medical evidence Dr. Shah noted on his own RFC to support such extreme limitations, yet none of the other doctors ordered similar restrictions. *See* R. 296. Such conflicting opinions indicate Dr. Shah's opinion may be biased or sympathetic towards Claimant. *See, e.g., Ketelboeter v. Astrue*, 550 F. 3d 620, 625 (7th Cir. 2008) ("The treating physician's opinion is important because that doctor has been able to observe the claimant over an extended period of time, but it may also be unreliable if the doctor is sympathetic with the patient and thus 'too quickly find[s] disability.'") (citations omitted). Second, as noted above, the ALJ accepted portions of Dr. Shah's opinion, but not others. Thus, in reevaluating Dr. Shah's opinion, the ALJ was entitled to—and did—discount Dr.

Shah's opinion because it was "inconsistent with the consulting physician's opinion, internally inconsistent, or based solely on the patient's subjective complaints . . . ." *Id.*[12]

In addition to appropriately giving little weight to Dr. Shah's RFC, the ALJ also adequately considered the opinions of Claimant's other treating physicians. In fact, the ALJ found the opinions of Dr. Segura and Dr. DePhillips to be "generally in conformance" with the ALJ's own RFC. R. 372. In so concluding, the ALJ found these opinions "were basically for sedentary postural but light exertional limitations, with some additional environmental restrictions." *Id.* While Dr. Segura and Dr. DePhillips both found restrictions, both of these neurological specialists found Claimant was able to return to work. For example, Dr. DePhillips released Claimant to work, subject to a ten pound lifting restraint, and "no excessive bending, twisting, or stooping, with no climbing as well as no prolonged sitting or standing." R. 105. In a follow-up examination, Dr. DePhillips found Claimant had reached his "maximum medical improvement" and that his restrictions should be permanent. R. 106. Dr. DePhillips never found Claimant was unable to do anything less than sedentary work.

Dr. Segura also released Claimant to work with restrictions on bending, twisting, and lifting. *See* R. 127, 178. Furthermore, the ALJ adequately explained why he discounted a

---

[12] Claimant also argues the ALJ erred in commenting that Exhibit 11F was unsigned. *See* Dkt. 18, at 11. Claimant asserts this because Dr. Shah's RFC is signed and "is clearly the opinion of Dr. Shah." *Id.*; R. 297. The Commissioner accepts this contention. Dkt. 24, at 8 n.3. ("For the purposes of this brief, the Commissioner will assume that Exhibit 11F contained the opinion of Dr. Shah as asserted by [Claimant]."). Given the ALJ's discussion that he would not have given controlling weight to this exhibit even if signed, this Court finds this error was harmless. *See* R. 373.

form filled out by Dr. Segura for Claimant's worker's compensation claim.[13]  *See* R. 165-67.

This form indicates Claimant was not capable of sedentary work, but the ALJ did not find

this persuasive because the restrictions contained in the form were "inconsistent as a whole,

no further explanation for these limitations were given, and the medical record does not

support this type of conclusion."  R. 372.  Such inconsistencies include a total restriction of

sitting or walking for no more than one hour, but also that Claimant was able to stand for at

least eight hours and lift and/or carry up to twenty-five pounds.  R. 372; *see* R. 167.  Thus

not only did the ALJ adequately credit the opinion of Dr. Segura, the ALJ also adequately

explained why he discounted portions of Dr. Segura's opinion.  More importantly, just like

Dr. DePhillips, Dr. Segura never found Claimant was unable to do anything less than

sedentary work.

   The restrictions found by Dr. DePhillips and Dr. Segura are thus consistent with the

ALJ's RFC for sedentary work with a sit/stand option.  As detailed by the ALJ, "[t]o the

extent that [the RFC's of Claimant's treating physicians] may be construed to prevent *all*

work" he did not give them controlling weight.  R. 372 (emphasis added).  Claimant argues

Dr. Segura's restrictions on bending are inconsistent with the ALJ's RFC, but Social Security

---

[13] As noted by both parties, the ALJ appears to have made a labeling error in referencing Exhibit 4F.  *See* Dkt. 18, at 11; Dkt. 24, at 7 n.1.  Exhibit 4F is Dr. DePhillips' records and reports.  The restrictions discussed by the ALJ in his opinion are actually contained in Exhibit 5F, which include Dr. Segura's records and reports.  *See* R. 165-67.  Nothing in this mislabeling of the exhibits hints at affecting the ALJ's conclusion as the ALJ neither attributed this exhibit to Dr. DePhillips, nor discredited Dr. DePhillips' opinion using this form.  Therefore, this Court finds the error was harmless.

Ruling 96-9p makes clear that while "[a] *complete* inability to stoop would significantly erode the unskilled sedentary occupational base and a finding that the individual is disabled would usually apply, [a] restriction to occasional stooping should, by itself, only minimally erode the unskilled occupational base of sedentary work." 1996 WL 374185, at *8 (emphasis in original).

Furthermore, the ALJ properly rejected a conclusory statement contained in a letter from Connie Lennox, of Dr. Shah's office. The letter states Claimant "has had a hard time working even with restrictions [and] . . . Dr. Shah and Dr. Dephillips [sic] feel [Claimant] should be on permanent disability." R. 302. As the ALJ pointed out, the fact that Claimant "had a hard time" does not indicate "a finding of total disability from either Dr. Shah or Dr. DePhillips." R. 302; 372. As discussed above, Dr. DePhillips' own treatment notes do not indicate such a finding of "total disability." R. 302; 372. Additionally, conclusory statements about whether Claimant was "disabled" are, as the ALJ asserted, not medical opinions, but instead "administrative findings dispositive of a case." R. 373; *see Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) ("A claimant, however, is not entitled to disability benefits simply because a physician finds that the claimant is 'disabled' or 'unable to work.' Under the Social Security regulations, the Commissioner is charged with determining the ultimate issue of disability."); 20 C.F.R. § 404.1527(e)(2).

Aside from adequately explaining his conclusion regarding Claimant's treating physicians, the ALJ also properly considered other evidence in the record supporting his conclusion that Claimant was not disabled, especially (1) Claimant's own admission in the

"Terms of Settlement" of his worker's compensation case and (2) the ME's opinion.

On July 26, 2002, Claimant signed the "Terms of Settlement" agreement acknowledging he "has not had any medical care for his lumbar spine since November, 2000" and that "he has declined any further care, including lumbar surgery as recommended by his treating physicians. . . ." R. 300-01. Contrary to Claimant's argument, this "Terms of Settlement" acknowledgment does provide a logical basis for the ALJ's decision. Such an admission discredits Claimant's assertion that he was unable to work, regardless of whether he was still receiving medical care or not.

Next, the ALJ properly considered the evidence presented by the ME. Claimant argues Dr. Miller's opinion (1) should be given limited weight as a non-treating physician and (2) that Dr. Miller's opinion is inconsistent with the ALJ's RFC. Dkt. 18, at 13; Dkt. 25, at 5. This Court disagrees.

First, Claimant cites *Gudgel v. Barnhart* for the proposition that the ME's opinion "deserved limited weight and . . . [does] not constitute substantial evidence for rejecting the opinion of a treating doctor." Dkt. 18, at 13; Dkt. 25, at 5; *see* 345 F.3d 467, 470 (7th Cir. 2003). While this proposition is generally true, *Gudgel* also finds that "[a] treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Id.* As discussed above, the ALJ did not give controlling weight either to Dr. Shah's RFC or to that of Drs. Segura or DePhillips to the extent their opinions precluded all work. Thus, the ALJ was permitted to grant greater weight to the

ME—a non-examining, non-treating doctor—because the opinions of Claimant's treating doctors precluding Claimant from all work were inconsistent with the factual record and therefore inconsistent with the medical evidence. *See Ketelboeter*, 550 F.3d at 625; 20 C.F.R. § 404.1527(d)(2).

Second, Claimant argues Dr. Miller's RFC is inconsistent with the ALJ's RFC. Dkt. 18, at 13; Dkt. 25 at 5. In his opinion, the ALJ "[gave] considerably more weight to the opinion of" the ME, who testified that Claimant was capable of light work, while the ALJ found an RFC of sedentary work. *Compare* R. 428 *with* R. 372. However, as the Commissioner argues, the context of this statement and the ALJ's weight to Drs. Segura and DePhillips show that the ALJ gave the most weight not to Dr. Miller, but instead to the two neurological specialists who treated Claimant and who never found Claimant to be completely precluded from working. Dkt. 24, at 11; *see* R. 372. Hence, the ALJ properly gave Claimant the benefit of the doubt in crafting the sedentary work RFC that generally conformed with Drs. Segura and DePhillips opinions, as opposed to the light work RFC of the ME.

Additionally, and in contrast to ALJ Mondi, who relied upon the RFC of the state agency physicians, ALJ Armstrong rejected the opinions of the state agency physicians as "inconsistent with the medical facts and findings in the record." *Compare* R. 22 *with* R. 372; *see also Ulloa*, 419 F. Supp. 2d at 1036 (District Court's remand of ALJ Mondi, finding, *inter alia*, "the ALJ failed to explain how the agency physicians' opinions were consistent with the medical evidence or [Claimant]'s activities"); R. 455-56.

In sum, the ALJ adequately articulated his reasons for why Claimant was not disabled as per the remand order.

## C.     The ALJ's Credibility Determination Was Not Patently Wrong.

A reviewing court will overturn an ALJ's adverse credibility determination if it is patently wrong. *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003). The Court must accord special deference to the ALJ's credibility determinations because the ALJ "is in the best position to see and hear the witness and determine credibility." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). This deference may be tempered "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations such as a claimant's demeanor[.]" *Clifford,* 227 F.3d at 872 (quoting *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994)).

Here, the ALJ found "[C]laimant is generally credible." R. 372. The ALJ went further: "[Claimant] reported some relief with medications. Although he complained of exacerbations of pain, physical examinations continued to be normal." *Id.* Claimant argues the ALJ erred in finding Claimant "generally credible," but not explaining why the ALJ discounted portions of Claimant's testimony. *See, e.g.,* Dkt. 18, at 13-14.

This Court notes that Claimant's credibility was not part of the remand order. *See* R. 405. More significantly, the first district court decision did not reverse ALJ Mondi's credibility determination. *See Ulloa*, 419 F. Supp. 2d at 1037-38; R. 457-58. During the review of ALJ Mondi's credibility determination, Claimant made similar arguments to the ones he now brings in the present case: namely the limitations he testified to (including pain,

dizziness, and limitations on sitting, standing, and walking) were consistent with Dr. Shah's opinion. *Compare Ulloa*, 419 F. Supp. 2d at 1037; R. 457 *with* Dkt. 18, at 14. As discussed above, this Court found the ALJ properly discounted portions of Dr. Shah's opinion.

Furthermore, an ALJ may properly discount portions of a claimant's testimony. *Powers v. Apfel*, 207 F. 3d 431, 435-36 (7th Cir. 2000) ("The discrepancy between the degree of pain attested to by the witness and that suggested by the medical evidence is probative that the witness may be exaggerating h[is] condition. For the hearing officer to rely on this as evidence of a lack of complete candor cannot be deemed patently wrong."). In the first district court case, ALJ Mondi discounted portions of Claimant's testimony and Judge Mason relied upon the ALJ's findings that "showed that [Claimant]'s disc was not significantly herniated and that the findings on examination revealed no motor weakness or atrophy" in holding ALJ Mondi's credibility determination was not patently wrong. *Ulloa*, 419, F. Supp. 2d at 1037-38; R. 457-58. In the present case, ALJ Armstrong also made similar factual findings that discounted Claimant's testimony. For example, he noted "[n]eurological examination[s were] normal" and that "[t]here was no significant nerve root compression or radiculopathy." R. 371. These normal neurological findings were often accompanied, as noted by the ALJ, with complaints of lower back pain. *Id.*; *see, e.g.,* R. 127, R. 284. Furthermore, the ALJ specifically noted Claimant "reported some relief with medications." R. 372. The record supports this conclusion. *See*, *e.g.,* R. 91, R. 313-15; *see also* R. 246 (Claimant's statement about physical therapy: "I feel [t]herapy has helped me a lot . . . ."). Therefore, the ALJ properly discounted portions of Claimant's testimony by accounting for

Claimant's self-reported improvements and discrepancies with objective medical evidence. *See Ehrhart v. Sec'y of Health and Human Serv.*, 969 F. 2d 534, 539 (7th Cir. 1992) ("There is nothing anomalous, then, about an ALJ finding a claimant's testimony to be generally credible yet still determining that the claimant is not physically or mentally limited in the manner he claims to be.").

In sum, the ALJ's credibility determination was not patently wrong.

## D.      The ALJ Properly Considered the Testimony from the Vocational Expert.

Claimant asserts the ALJ erred in considering testimony from the VE for two independent reasons. First, Claimant asserts the ALJ's hypothetical did not include some of Claimant's limitations based on objective medical evidence, including missing work and the inability to work a full day. *See* Dkt. 18, at 14-15. However, as addressed above, the ALJ properly rejected certain extreme portions of Dr. Shah's limitations and Claimant's testimony as not supported by the medical evidence. Therefore, the ALJ's hypothetical was proper. *Jens*, 347 F.3d at 213 ("[T]he ALJ must question the vocational expert regarding every impairment set forth in the claimant's record *to the extent that the impairment is supported by the medical evidence*.") (emphasis added).

Second, Claimant asserts the ALJ did not explain why he "disregarded" portions of the testimony of the VE at the hearing before ALJ Mondi. Dkt. 18, at 15. Claimant points to *Naudain v. Apfel*, a Central District case, for the proposition that the ALJ was required to consider testimony from the earlier VE. 119 F. Supp. 2d 812, 818-19 (C.D. Ill. 2000). This case, however is inapposite for two reasons. First, *Naudain* is factually distinct from the

present case as it dealt with a second hearing where no additional VE testified. *Id.* Second, *Naudain* found that "an ALJ *may* properly rely upon evidence presented at a prior hearing in making his determination." *Id.* at 818 (emphasis added). Claimant points to no other case within the Seventh Circuit requiring an ALJ to do what Claimant argues and as the Commissioner asserts, the line of questioning by ALJ Mondi significantly differed from that of ALJ Armstrong. *See* Dkt. 24, at 14. *Compare* R. 350-56 *with* R. 431-35. Instead, ALJ Armstrong properly considered the testimony before him.

In sum, the ALJ properly considered the testimony of the VE.

## IV. CONCLUSION

The Court finds the following: (1) substantial evidence supports the ALJ's decision that Claimant was not disabled; (2) the ALJ adequately articulated the grounds for his conclusion; (3) the ALJ's credibility determination was not patently wrong; and (4) the ALJ properly considered the testimony from the Vocational Expert. **For the reasons set forth in this opinion, the Court denies Claimant's motion to reverse or remand the final decision of the Commissioner and grants the Commissioner's motion to affirm the Commissioner's decision that the Claimant was not disabled for the period from February 17, 2000 through January 31, 2003.**

**SO ORDERED THIS 9th DAY OF APRIL, 2009.**

*Morton Denlow*

**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Copies sent to:**

M. Jacqueline Walther
Robert C. Kielian
33 W. Jackson Blvd., Suite 201
Chicago, IL 60604

Counsel for Claimant

Donald R. Lorenzen
Assistant United States Attorney
219 S. Dearborn St.
Chicago, IL 60604

Alfred C. Sanchez
Donna L. Calvert
John J. Lee
Social Security Administration
200 W. Adams St., 30th Floor
Chicago, IL 60606

Counsel for Defendant